UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TULE LAKE COMMITTEE, | No. 2:18-cv-02280-KJM-CMK |
| Plaintiff, | |
| v. | ORDER |
| CITY OF TULELAKE, et al., | |
| Defendants. | |

Plaintiff Tule Lake Committee (Committee) seeks a temporary restraining order to prevent defendant City of Tulelake (City) from implementing an ordinance adopted by defendant City Council of the City of Tulelake (City Council), set to take effect on August 30, 2018. App., ECF No. 2-1 at 5.[1] The Ordinance approves the City's sale of property to defendant Modoc Tribe of Oklahoma (Modoc Tribe), which the Committee contends violates its constitutional rights and poses a grave risk of irreparably harming a historic site, the Tule Lake Segregation Center (Center).

The court heard argument on August 24, 2018. Mark Merin, Yoshinori Himel and Paul Masuhara appeared on behalf of the Committee, and Barbara Takei, CFO for the Committee, was also in attendance. Timothy Hennessy and Greg Narvaez specially appeared on behalf of the

---

[1] All citations to the briefs and accompanying exhibits refer to ECF page numbers.

1

Modoc Tribe, asserting the Tribe's sovereign status.  Curiously, Messrs. Hennessy and Narvaez also specially appeared on behalf of the City and City Council.[2]  For the following reasons, the motion is DENIED without prejudice.

I. FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

This case is motivated by concerns regarding preservation of the area including the Tule Lake Segregation Center, a historic site where more than 18,000 Americans of Japanese descent were wrongfully detained during World War II.  App. at 5.[3]  More than 331 people died at the Center before it closed in March 1946.  *Id.* at 5, 6.  Despite a long delay in national recognition of this great wrong, the Civil Rights movement brought "genuine national remorse at having stripped an unpopular racial minority of the rights, freedoms, and dignity that Americans cherish, and a desire to educate the nation on the history."  *Id.* at 5-6.  Today, survivors of the internment camps as well as their descendants make "pilgrimages" to former internment sites, and the Center is regularly visited by many such "pilgrims."  *Id.* at 6.

The State of California designated the Center as a State Historic Landmark in 1975.  *Id.*  In 2006, a 37-acre portion of the site was designated the Tule Lake Segregation Center National Historic Landmark, which is managed by the National Park Service.  *Id.*  The Tule Lake Unit is part of the national monument known as World War II Valor in the Pacific, dedicated by President Bush in 2008.  *Id.*  Prior to these more recent acts of recognition, in 1951, the United States conveyed another 358 acres of the historic site to the City for use as an airport.  *Id.* at 5.  The federal government's grant to the City is conditioned on the land's use as an airport, with the

---

[2] Mr. Hennessy explained his appearance on behalf of the City and City Council was limited because the scope of his representation of the City and City Council was not yet settled.  Mr. Hennessy nonetheless confirmed that he was authorized to argue on the City and City Council's behalf.  In response to the court's questioning, he indicated he had not obtained conflict waivers from the parties and appeared uncertain that he needed waivers.

[3] The Committee's memorandum of points and authorities in support if its motion for a temporary restraining order contains citations to its verified complaint, ECF No. 1, throughout.  The court includes only citations to the memorandum, termed "App." here.  And although the Committee filed a verified first amended complaint, ECF No. 5, after filing its temporary restraining order application, the minor amendments do not change the court's analysis.  *See* ECF No. 5 ¶¶ 29, 67, 78 (amending paragraphs ¶¶ 29, 67, 78 in ECF No. 1).

| | |
|---|---|
| 1 | land to revert to the federal government if used for other purposes. *See id.* at 10 (quoting |
| 2 | transcript from City Council meeting). The Tule Lake Airport (Airport) is sponsored by Modoc |
| 3 | County (County). *Id.* at 7. The City leases the Airport property to Modoc County. *Id.* at 10 |
| 4 | (quoting transcript from City Council meeting). |
| 5 |    The Committee is a non-profit public benefit corporation incorporated in 1981 to |
| 6 | represent the interests of the Center's incarcerees and their descendants. *Id.* at 6. The Committee |
| 7 | has obtained more than $850,000 in grant funds to preserve the Tule Lake Segregation Center. |
| 8 | Decl. of Barbara Takei ("Takei Decl."), ECF No. 2-3, ¶ 1. Dedicated to educating the public |
| 9 | about the internment of individuals of Japanese descent during World War II and the unique role |
| 10 | the Center played in that history, the Committee seeks to preserve the history and experiences of |
| 11 | the Center's inmates. App. at 6-7. These preservation efforts include preserving historic |
| 12 | structures and "protect[ing] the fabric of the site using State Environmental laws." Takei Decl. |
| 13 | ¶ 3. |
| 14 |    Modoc County, which is not a party to this case, has sought to expand the Airport |
| 15 | over the years. App. at 7. In 2014, the County proposed a multi-year, $3.5 million airport |
| 16 | improvement plan involving construction of a three-mile long, eight-foot high fence topped with |
| 17 | barbed wire, which would have "close[d] off most of the concentration camp land where Japanese |
| 18 | Americans had lived and died." *Id.* The County also sought to extend its 1974 lease to 2044. *Id.* |
| 19 | The Committee opposed the County's efforts on both fronts, protesting the lease extension and |
| 20 | calling for an Environmental Impact Report (EIR) on the County's proposed construction. *Id.* |
| 21 | The Committee contends the County never conducted an EIR as required on its airport |
| 22 | construction projects. *Id.* |
| 23 |    The Committee eventually filed two California Environmental Quality Act |
| 24 | (CEQA) mandamus actions in state court, seeking an EIR, and naming the City as the Airport's |
| 25 | owner and lessor and the County as the lessee; these actions are pending. *Id.* at 7-8. Although |
| 26 | the County modified language in the lease extension to remove reference to its construction plan, |
| 27 | it did not address CEQA concerns that the construction plan raised. *Id.* The Committee and the |
| 28 | County are currently in settlement discussions, but no settlement discussions with the City or |

Nick Macy, who runs a crop dusting business out of the Airport, Macy's Flying Service, have taken place. *Id.* at 7.[4]

In late 2017, the City began considering selling the Airport land. At a November 7, 2017 City Council meeting, the City retained attorney Michael Colantuono for assistance in the "possible transfer of the [land under] Tulelake Airport" and appointed Colantuono, Will Sargent[5] and the City's mayor to act as the City's real estate negotiators in the possible transfer. Ex. 2-A, ECF No. 2-4 at 27 (regular meeting minutes). Later at that same Council meeting, the Council entered a 40-minute closed session for negotiations on the possible transfer with the Modoc Tribe, Macy's Flying Service and Modoc County, citing California Government Code § 54956.8. *Id.*[6]

On January 26, 2018, the Committee sent the City's mayor a letter expressing its interest in buying the Tulelake Airport, which "occupies a significant part of the historic WWII Tule Lake concentration camp site, which is of immense importance to Japanese Americans." Ex. 2A, ECF No. 2-4 at 29. The Committee followed up in a February 29, 2018 email, noting it had not received a response to its letter of interest in the Airport property and requesting the Committee "be given consideration as a potential purchaser." Ex. 4, ECF No. 2-4 at 34.

/////

---

[4] The Committee's first amended complaint alleges that "Nonparty Macy's Flying Service and its owner, Nick Macy, operate the airport by agreements with the County, and operate a cropdusting business quartered at the airport." First. Am. Compl., ECF No. 5 ¶ 3.

[5] Neither the Application nor the Committee's operative complaint expand on Sargent's role.

[6] Section 54956.8 provides in pertinent part:

> Notwithstanding any other provision of this chapter, a legislative body of a local agency may hold a closed session with its negotiator prior to the purchase, sale, exchange, or lease of real property by or for the local agency to grant authority to its negotiator regarding the price and terms of payment for the purchase, sale, exchange, or lease.
>
> However, prior to the closed session, the legislative body of the local agency shall hold an open and public session in which it identifies its negotiators, the real property or real properties which the negotiations may concern, and the person or persons with whom its negotiators may negotiate.

Cal. Gov't Code § 54956.8.

4

Colantuono responded that day, stating only, "Your email is received. No decisions have been made." *Id.*

In the meantime, the Council held a February 6, 2018 closed session to conference on the Tulelake Airport property with negotiating parties, Modoc Tribe, Macy's Flying Service and Modoc County. Ex. 3, ECF No. 2-4 at 31-32. It held other such closed sessions on April 5 and May 1 with City negotiators, the City's mayor, Will Sargent, Colantuono and Councilmember Gary Fensler as an alternate, stating "under negotiation: update regarding negotiations with FAA regulations with possible transfer of the Tulelake Airport, conditions, terms and price." Ex. 5, ECF No. 2-4 at 36; Ex. 6, ECF No. 2-4 at 38-39. It held two more closed sessions on May 15 and June 19 to negotiate terms and price with the Modoc Tribe. Ex. 7, ECF No. 2-4 at 47-48; Ex. 9, ECF No. 2-4 at 54.

On July 3, 2018, the City proposed Ordinance Number 2018-16-01 to authorize the sale of the Tulelake Airport land to the Modoc Tribe for $17,500. App. at 8; Ex. 11, ECF No. 2-4 at 62-63 (ordinance); *see* Himel Decl., ECF No. 2-4 ¶ 18 (representing the attached ordinance is "said to have been proposed July 3, 2018"). The Committee learned of the Ordinance on July 12, 2018, App. at 8, and sent a letter to the City Council and Tulelake's mayor the next day, offering to purchase the airport for $40,000, Ex. 12, ECF No. 2-4 at 65. On July 17, 2018, the City Council held a public meeting to consider the ordinance and then approved the ordinance. Ex. 13, ECF No. 2-4 at 67-68.

On July 25, 2018, the Committee sent the City a "request to be placed on the agenda" for the Council's July 31, 2018 meeting at 4:00 p.m. to present its proposal to purchase the Airport property. Ex. 14, ECF No. 2-4 at 70. A Tulelake City Hall administrator responded to the request by email, explaining that because the City "has given notice of a public hearing on the possible sale of the land underlying Tulelake Airport at 5:30 p.m. . . . . it will not be necessary or appropriate to separately agendize your proposal for that sale." Ex. 15, ECF No. 2-4 at 73. Rather, the administrator explained the Committee could speak at the hearing, and suggested it send its proposal to Colantuono in advance. *Id.* Finally, she explained a special meeting on the

/////

5

sale "limited to a closed session" was noticed for 4:15 and "no public discussion of the airport sale . . . will be appropriate earlier than . . . 5:30 pm." *Id.*

On July 27, 2018, the Committee submitted its offer to Colantuono. Ex. 16 at 75-76. The terms of the offer included $40,000, a covenant to maintain the site as an airport, to take title subject to several leases, and the Committee's agreement to dismiss the City from its two pending CEQA mandamus actions and waive the costs of suit. Ex. 16, ECF No. 2-4 at 75. On an unspecified date, the County made an offer, not reduced to writing, to match the Modoc Tribe's terms. App. at 10-11.

Minutes for the July 31, 2018 City Council special meeting indicate the Council conferenced on the possible transfer of the Airport property with negotiating parties the Modoc Tribe, the Committee, and the County. Ex. 17, ECF No. 2-4 at 81. The Council then entered a closed session with "Real Property Negotiators." *Id.*

The 5:30 p.m. meeting set for public discussion of the ordinance followed. *Id.*; Ex. 18, ECF No. 2-4 at 83. At the public meeting, Colantuono provided a what he described as a "staff report," which included no mention of the site's historic importance to Japanese American descendants of incarcerees. App. at 9. He described the City as the "nominal owner" of the airport property, explaining the City merely "own[s] the dirt," and has "leased the dirt to the County" to act as the Airport sponsor, under a lease agreement "that has another 24 years to go" that "[n]obody can disturb . . . ." *Id.* at 10 (quoting rough transcript from meeting). He framed the relevant "question" as whether the City should continue on as "the nominal owner of the piece of dirt under an airport that so far has gotten [the City] sued a couple of times." *Id.* Introducing the Modoc Tribe's $17,500 offer, Colantuono noted that although some may wonder why the offer is so low, $17,500 was enough to cover his fee and even if the City made extra money, it would necessarily go "back into the airport . . . . So there's no way for the town to sell it for more and to make more money for the community's general fund." *Id.* at 9. He explained the agreement required the FAA's consent or the City Attorney's[7] decision that FAA approval is not

---

[7] The record suggests the City Attorney is Megan Annand, who worked with Colantuono in negotiating the Airport's sale. *See* Ex. 2, ECF No. 2-4 at 27 (Nov. 7, 2017 Council Minutes

6

required. *Id.*[8] He also explained that, "importantly to the community, another aspect of the agreement is that if the Modoc Tribe takes the land they have to defend and pay the lawyers for any lawsuits that the City might be involved in with respect to the airport going forward." *Id.*

Colantuono went on to note that the City had received the Committee's and the County's offers after the City "released the agenda showing this transaction." *Id.* He summarized the Committee's offer as including "essentially the same the same [*sic*] terms as the tribe with two differences." App. at 10-11. The first difference was the Committee's offer to pay $40,000. *Id.* at 11. The second difference was, unlike the Modoc Tribe's offer, the Committee provided "no promise to indemnify but there is a promise to dismiss [the City] from the existing lawsuit, which you might view as effectively the same thing." *Id.* Colantuono then noted the County's oral offer to "match the terms . . . negotiated with the Tribe." *Id.* Finally, Colantuono noted that in the closed session held earlier that day, he "provided a little bit of legal advice to the City Council about all three of these proposals . . . ." *Id.*

The Committee then gave a three-minute presentation on its offer, subject to the mayor's time restrictions. *Id.* Neither the mayor nor the Council asked the Committee any questions or provided any comments. *Id.* A County representative attended the meeting but did not make a presentation on its offer. *Id.* The mayor asked the Modoc Tribe representatives what types of businesses the Tribe would bring to the area, and received the response, "anything to support aviation. . . . an airport the FAA requires you to have aviation-supportive businesses, so,

---

appointing Colantuono as negotiator in the sale "who will stay in touch with the City Attorney, Megan Annand and work each task and decide the price of it"); Ex. 11, ECF No. 204 at 63 (proposed ordinance for sale of Airport property to the Modoc Tribe identifying Annand as the "City Attorney" in signature block for her approval as to form); *but see* Merin Decl. ECF No. 2-2 ¶ 6 (identifying Megan Annand "as general counsel of the City of Tulelake" and noting Annand informed the Committee's counsel that Colentuono is the City's "attorney in respect to the sale of the Tule Lake Segregation Center" and Colentuono, not Annand, should be notified of proceedings in this action).

[8] The ordinance adopted by the City Council phrases the FAA consent requirement somewhat differently, requiring the Tribe as buyer to "obtain the consent of the Federal Aviation Administration to the transfer of the Property to Buyer as a condition to close of escrow." ECF 2-4 at 62. There is no indication in the record whether the Tribe has obtained the required consent, or taken steps to do so.

that's indeed the type of enterprises that we look to help put in to the Tulelake Municipal Airport down there." *Id.* The Council unanimously approved the ordinance. App. at 18 (July 31, 2018 Council minutes approving Ordinance No. 2018-16-01). The ordinance will take effect on August 30, 2018. Takei Decl. ¶ 2; *see* Ex. 11 (proposed ordinance 2018-16-01 § 4 providing "This Ordinance shall take effect 30 days after its adoption pursuant to California Government Code Section 36937 . . . ."). It is not clear from the face of the proposed ordinance whether the sale to the Modoc Tribe becomes final upon the ordinance's effective date, or whether escrow opens on that date. *See* Ex. 11 (referring to the City and Modoc Tribe's negotiated "Standard Offer and Agreement for Purchase of Real Estate (Non-Residential)," which is not included in the record, despite the Ordinance's notation that that the agreement is "attached").

The Committee sued the City, the City Council and the Modoc Tribe on August 21, 2018 alleging violation of due process, equal protection and petition rights, all under 42 U.S.C. § 1983, as well as violation of the California Ralph M. Brown Act. Complaint, ECF No. 1. The Committee filed its ex parte application for a temporary restraining order that same day, arguing it was likely to prevail on the merits of its procedural due process and class-of-one equal protection claims, without mention of its § 1983 claim as to the right to petition or the Brown Act claim. *See* App. On August 22, 2018, the Committee filed a first amended complaint asserting the same claims, with minor modifications to the allegations. First. Am. Compl. (FAC), ECF No. 5. Although the City, City Council and Modoc Tribe specially appeared at hearing to oppose the application, none filed an opposition.

II.   LEGAL STANDARD

The purpose of a temporary restraining order (TRO) is to preserve the status quo pending the complete briefing and thorough consideration contemplated by full preliminary injunction proceedings. *See Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438-39 (1974) (TROs "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer"). In general, the showing required for a TRO and a preliminary injunction are the same. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir.

2001). The party requesting preliminary injunctive relief must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008).

Alternatively, courts may analyze a TRO request using a sliding scale approach through which the elements of the "test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). This test requires plaintiffs to demonstrate the requisite likelihood of irreparable harm, show that an injunction is in the public interest, raise "serious questions" going to the merits, and show a balance of hardships that "tips sharply" in plaintiffs' favor. *Id.* at 1131-36 (concluding that the "serious questions" version of the sliding scale test for preliminary injunctions remains viable after *Winter*). A TRO is an extraordinary remedy, and plaintiffs have the burden of proving the propriety of such a remedy. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).

III. DISCUSSION

    A. Likelihood of Success on the Merits

        1. Procedural Due Process

"A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Brewster v. Bd. of Educ.*, 149 F.3d 971, 982 (9th Cir. 1998). Here, the Committee clarified at hearing that it advances both protected property and liberty interests, rooted in the California Constitution.

Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 931 (9th Cir. 2017) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). But a property interest exists only upon "a legitimate claim of entitlement, not merely an abstract need or desire for the particular benefit." *Id.* (citing *Roth*, 408 U.S. at 577). Under certain circumstances, states may create liberty interests that are protected by the

9

1 Due Process Clause, and "[a] state official's failure to comply with state law that gives rise to a
2 liberty or property interest may amount to a procedural (rather than substantive) due process
3 violation, which can be vindicated under 42 U.S.C. § 1983." *Marsh v. Cty. of San Diego*, 680
4 F.3d 1148, 1155 (9th Cir. 2012) (citations omitted). The relevant state law must contain "(1)
5 substantive predicates governing official decisionmaking, and (2) explicitly mandatory language
6 specifying the outcome that must be reached if the substantive predicates have been met." *Id.*
7 (citing *James v. Rowlands*, 606 F.3d 646, 656–57 (9th Cir. 2010)).

8 Here, the Committee currently advances one argument in support of its purported
9 property and liberty interests: it contends the California Constitution creates a right protected by
10 the Fourteenth Amendment's Due Process Clause by withholding from local governments the
11 "power to make any gift or authorize the making of any gift, of any public money or thing of
12 value to any individual, municipal or other corporation whatever . . . ." Cal. Const. art. XVI, § 6.
13 Case law has interpreted "gift" "to mean not only a transfer of property without adequate
14 consideration but a transfer made for a private as opposed to a public purpose." *Post v. Prati*, 90
15 Cal. App. 3d 626, 635 (Cal. Ct. App. 1979). Put differently, the California Constitution prohibits
16 a local government from "making a gift of public money [or thing of value] for a private
17 purpose." *Besaro Mobile Home Park, LLC v. City of Fremont*, 204 Cal. App. 4th 345, 357
18 (2012).

19 In its TRO application, the Committee does not persuasively explain how any
20 defendant here has violated § 6. In its operative complaint, the Committee contends the historic
21 site is a "thing of value within the meaning of Cal. Const. a<ins>A</ins>rt. XVI<ins>,</ins> § 6," Compl. ¶ 56; *see also*
22 FAC ¶ 56, and that by selling the Airport property for $17,500, the City effectively "gave away
23 the historic site for free," Compl. ¶¶ 59, 61; FAC ¶¶ 59-61. Even assuming these conclusory
24 allegations, none of which are repeated in the TRO application, sufficed to establish that the City
25 transferred the property without adequate consideration under § 6, the Committee has not
26 explained how the transfer was made for a private rather than public purpose. *See Post*, 90 Cal.
27 App. 3d at 635.
28 <ins>/////</ins>

10

At hearing, the Committee argued the transfer was for a private purpose because the Airport property would be transferred to the "private" Modoc Tribe, which intends to develop the property into a "commercial hub," exclusively for its own enrichment and with no concern for the larger site's significant cultural and historical value. The Modoc Tribe strongly disagrees with that characterization, noting at hearing it is a tribal government, not a "private" entity, and that it is committed to supporting the public airport. *See* Ex. 11 (proposed ordinance finding "the property will continue to be used as a public airport"). The Committee counters that the Modoc Tribe is not subject to the same regulations to which a public entity is subject, and that its sovereignty potentially shelters businesses seeking to avoid public inquiry and regulations. The Committee does not explain why sale to the Committee would not have constituted a transfer for a private purpose. These competing arguments do not change the fact that the Committee's application does not provide the court with the information or authority necessary to establish a colorable claim that the transfer was for a private purpose under the California Constitution in violation of § 6.

Aside from these deficiencies, the Committee appears to take for granted that if defendants have violated the California Constitution they also violate a federal constitutional right. But the Committee has not explained how § 6 creates in the Committee a right enforceable under the Due Process Clause. Nothing in the Committee's application indicates that § 6 vests in the Committee "a legitimate claim of entitlement" to a property interest at issue. *See Roybal*, 871 F.3d at 931. Additionally, even assuming the truth of the Committee's conclusory assertion that § 6 creates a protected liberty interest, *see* App. at 15-16, the Committee has not provided the court with any basis to conclude that the Committee itself holds and may vindicate the liberty interest it asserts.

The Committee's complaint alleges it "has a legal and equitable interest in the historic site, both as a bona fide (and the high) bidder and as a representative of" incarcerees, their descendants and all interested in the Center's history and preservation, Compl. ¶ 57; FAC ¶ 57, but the Committee's TRO application does not clearly rely on these allegations or explain how they establish a protected interest under the United States Constitution. The Committee also

notes that survivors, descendants of survivors and the public have an interest in visiting and preserving the Tule Lake site, which it avers is sacred to some and of historic importance to all. It poignantly avers that the remains of incarcerees may exist on the site, *see* App. at 6, 7, and that underground rooms dug by incarcerees may exist and may be disturbed by development, Takei Decl. ¶¶ 11-12. The court acknowledges and for purposes of this application accepts all of these representations. Doing so does not mean the Committee has explained how the powerful interests it advances create a property or liberty interest protected by the Due Process Clause and rooted in the California Constitution. There may well be due process rights implicated by defendants' actions reflected in the Committee's filings, but the court cannot make arguments likely to prevail on the Committee's behalf.

At this point, the Committee has not shown it is likely to prevail on the merits of its procedural due process claim.

2. Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment provides that no state shall deny to any person within its jurisdiction the equal protection of the laws' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). Where a plaintiff does not allege membership in a class or group, it may prevail under a "class of one" equal protection theory by showing that it was "[1] intentionally [2] treated differently from others similarly situated and [2] that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008).

"The class-of-one doctrine does not apply to forms of state action that 'by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments.'" *Towery v. Brewer*, 672 F.3d 650, 660 (9th Cir. 2012) (quoting *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 603 (2008)). It is not clear whether this rule precludes a class of one claim here. *Cf. Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 592 (9th Cir. 2008) (declining to decide whether class of one theory applies in "the public bidding context"). The court notes,

12

however, that under the framework established for its bidding process, the City presumably could not accept more than one offer for the Airport property, and in selecting a winning offer it would necessarily render certain offerors losers. Because "the existence of discretion, standing alone, cannot be an Equal Protection violation," the Committee must show, "[a]t the very least, . . . some respect in which the discretion is being exercised so that the complaining individual is being treated less favorably than others generally are." *See Towery*, 672 F.3d at 660-61.

Here, the court is left with doubt as to likelihood of the Committee's success on the merits. The Committee contends it, the Tribe and the County were "similarly situated" because each submitted an offer to purchase the Airport property. *See* App. at 18 (arguing that in all relevant respects, the three offerers are "'alike,' 'arguably indistinguishable,' or 'identical'") (quoting *Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*, 2016 U.S. Dist. LEXIS 75552, at *60 (E.D. Cal. June 8, 2016) (internal citations omitted)). It is not clear to the court that all offerors are similarly situated simply because they all made offers on the same property, a proposition the Committee has not supported at this point. The Committee is a non-profit public benefit corporation while the Tribe and County are governmental bodies. The Committee makes no mention of the fact that the Tribe and County, unlike the Committee, offered to fully indemnify the City. Relatedly, the Committee does not explain how it is similarly situated to the County, which currently operates the Airport, or how it was treated differently than the County, whose offer also was not accepted.

The Committee also makes only an abbreviated argument that the City acted without a rational basis. "[T]he rational basis prong of a 'class of one' claim turns on whether there is a rational basis for the *distinction*, rather than the underlying government *action*." *Gerhart v. Lake Cty., Mont.*, 637 F.3d 1013, 1023 (9th Cir. 2011) (emphasis in original). At hearing, defendants suggested the City had a rational basis for treating the Committee differently in light of its opposition to the Airport's expansion and pending suits against the City and County. That the Committee offered to "maintain the airport site as an airport," and to drop its pending lawsuits, undercuts the defendants' argument. *See* Ex. 16 ¶ 2. But the Committee ignores the indemnification distinction, which Colantuono described as "important[] to the community". *See*

*id.* The Committee also has not addressed Colantuono's statement that any money received from the sale will be returned to the federal government for the benefit of the airport, which arguably provided the City with a rational basis to prefer the Tribe's comprehensive indemnity offer accompanied by a lower monetary offer compared to the Committee's higher offer without a comprehensive indemnity term. And although it cites "the City's secretive closed meetings" as evidence of differential treatment, there is nothing in the record to indicate the City was not entitled to use closed sessions to discuss its negotiations with the Tribe, nor does the Committee advance any TRO argument based on its Brown Act claim. *See* Cal. Gov't Code § 54956.8 (permitting local governments to hold closed sessions with negotiators in land sale transactions); FAC ¶¶ 87-98 (alleging Brown Act claim).

Ultimately, the Committee does not actually argue it was singled out or treated differently. Instead, it argues "the City maintained a narrow focus on selling the historic site to the Tribe only." App. at 18. The Community has not identified a single case in which a similar class of claim was advanced, much less prevailed. Thus, although the record shows the Committee and the City have a contentious history, the Committee has not made the necessary showing that "the discriminatory treatment 'was intentionally directed just at [the Committee] . . . .'" *See N. Pacifica LLC*, 526 F.3d at 486 (quoting *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001)).

Here again, while there may be better support for the Committee's contention the City's decision was arbitrary or malicious, the Committee has not shown at this point it is likely to succeed on this claim.

In sum, the Committee has not carried its burden in establishing its likelihood of success on its constitutional claims.

B.  Irreparable Harm

On the other end of the spectrum, the Committee provides the court only with speculative statements regarding the irreparable harm it faces should the sale go forward. The Committee contends the sale will result in the Center's "ruinous development" at the Modoc Tribe's hands. App. at 18. There is no concrete explanation of the Modoc Tribe's plans or the

14

timing of those plans, except one of its representative's statements at the City Council meeting that the tribe would "support aviation." *See* Takei Decl. ¶ 10. Still, the Committee warns that the Center's incarcerees may have dug underground rooms and cellars, and these still-undiscovered rooms and cellars may be disturbed by the Modoc Tribe's anticipated development of the land. *Id.* ¶¶ 11-12.

The Committee's concerns appear to arise largely from its belief, not well supported by the record, that the Modoc Tribe is exempt from CEQA. *Id.* ¶ 6 (stating "I have been advised that the Tribe is exempted from CEQA"). The Committee also argues that although projects obtaining financial assistance from the FAA must adhere to the National Environmental Protection Act (NEPA) and the Department of Transportation Act Section 4(f), the Modoc Tribe's purported $80 million in cash on hand suggests it will not require FAA funding, and therefore "may be able to disregard the planning and procedural discipline that NEPA and Section 4(f) require." *Id.* ¶ 8 ("I understand the Tribe holds as much as $80 million in bank accounts."). The Committee contends Modoc Tribe representatives have not been receptive to the Committee's concerns regarding preservation of Japanese American history, and in fact may be hostile to those concerns. App. at 11-12; *see* Takei Decl. ¶ 9. Because the Committee believes "the planning procedures of environmental laws such as CEQA, NEPA, and Section 4(f), and historic preservation laws at the State level and through the National Historic Preservation Act," are necessary to ensure preservation of the Center, it has grave concerns about the ability to hold the Modoc Tribe accountable for any damage its plans may cause. *See* Takei Decl. ¶ 14.

The Committee's fears are understandable, but based on the record before the court they are speculative. The Committee has not identified a single Modoc Tribe plan that poses a threat to the Center, explained why concrete plans are not needed for the court to evaluate harm, or done more than speculate that the Tribe is immune from CEQA and all other regulations that govern its conduct. Although the Committee provides no authority for the proposition that the Tribe is immune from CEQA, NEPA or Section 4(f), it cites several authorities demonstrating successful enforcement actions against alleged abuses of tribal sovereign immunity. *See* App. at 13 (noting the California Supreme Court in *People v. Miami Nation Enterprises*, 2 Cal. 5th 222

(2016), held a tribe asserting tribal sovereign immunity bears the burden of showing by a preponderance of the evidence that it is an 'arm of the tribe'" and citing FTC and other governmental enforcement actions against tribal-owned entities). The Committee also represents that the County has never conducted an environmental impact report "for any of the airport's construction projects." App. at 7. It is unclear, then, why the Modoc Tribe's likely refusal to conduct EIRs poses a new emergency here, particularly when the Committee has not shown the Tribe would not be required to conduct such reports, or could not be joined to the pending state actions if they do not settle.

Finally, as noted above, the Committee represents that the National Park Service manages the Segregation Center; that the Center is part of the World War II Valor in the Pacific national monument; and that both the State of California and the federal government have designated the Center as a "historic landmark." The Committee's application does not address, however, whether the National Park Service, the State of California or the federal government are powerless to protect and preserve the Center from whatever threats may arise from the sale. The Committee does represent that the FAA and State Historic Preservation Office rejected the County's 2010 attempt to establish that the Airport land is "not eligible for listing on the National Register of Historic Places." App. at 7; *see* ECF No. 12-2 (indicating the Airport land is contained within the "[National Register of Historic Places] Eligible Tule Lake Segregation Center Historic District."). An entry in the City Council's June 5, 2018 minutes indicates the Council received "an overview of the National Park Service Management . . . that no boundary adjustments would occur on the 37 acres around the designated area around the Peninsula and Camp Tulelake." Ex. 8, ECF No. 2-4 at 50. These facts seem to indicate some ongoing role played by state and federal bodies with respect to the Center, or at least raises questions as to their authority with respect to the planned sale. These roles appear potentially significant in calculating the risk of irreparable harm, but neither the Application nor the parties' responses to the court's questions at hearing clarified the issue.

In sum, the court finds the Committee at this time has not carried its burden in establishing the likelihood of irreparable harm.

///

///

### C. Balancing of Equities

The Committee argues there is little harm in entering a temporary restraining order until the court holds a preliminary injunction hearing. This may be true, assuming escrow has still to open and it will take some time to close – questions not answered by the current record. But the Committee seeks an extraordinary remedy and must meet its burden for the balance of equities to tip in favor of the court's issuing a temporary restraining order.

### D. Public Interest

The Committee also argues a temporary restraining order would serve the public interest in light of the "allegedly-unlawful government conduct at issue" and because the public also has an interest in preserving the historically significant land. App. at 19. Again, for the purposes of this application, the court acknowledges that the Center is of significant historic and cultural significance and that its preservation is a concern for all. The court also acknowledges that, at hearing, the Modoc Tribe's attorney represented the property at issue is part of the Tribe's aboriginal territory, and that it creates a land bridge to Modoc Lake, which the Tribe views as its place of origin. *See* Ex. 1B, ECF No. 2-4 at 24-25 (April 4, 2017 letter from Modoc Tribe to Siskiyou County describing the area surrounding the site as its "ancestral territory and [] home to many artifacts and cultural items of our Tribe . . . the location of the Modoc War . . . [and] countless remains of our ancestors . . . ."). While the record is not well developed on the Tribe's status and its interest in the particular land covered by the proposed sale, the equitable interests at stake may well be significant for both the Committee and the Modoc Tribe.

In any event, more than the public's general interest in the Center and its preservation is required to support the relief requested here, and the Committee has not made the necessary showing at this time.

## IV. CONCLUSION

On the present record, the court finds the Committee has not met its burden to establish the necessity of the extraordinary remedy requested. The application for a temporary

17

1 | restraining order is DENIED without prejudice to renewal.  Any renewed application or motion
2 | for a preliminary injunction must address the deficiencies identified in this order.

Notwithstanding the court's denial of the instant request for a temporary restraining order, and whether or not plaintiffs renew their application, it appears this case requires an early case management conference.  Accordingly, the case is set for an early scheduling conference on **Wednesday, September 5, 2018, at 4 p.m**.  The parties shall file a joint status report by **Friday, August 31, 2018, at 4 p.m.** addressing the issues generally required by this court as well as whether expedited motion practice is required to streamline and focus the case.

IT IS SO ORDERED.

DATED:  August 27, 2018.

_____
UNITED STATES DISTRICT JUDGE