UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TULE LAKE COMITTEE,

    Plaintiff,

    v.

CITY OF TULELAKE, et al.,

    Defendants.

No. 2:18-cv-02280-KJM-DMC

ORDER

    In this civil rights case arising out of the sale of a plot of land in the City of Tulelake, California, defendants move to enforce the Interim Settlement Agreement and request that the court direct plaintiff to dismiss the case without prejudice according to the terms in that agreement. For the foregoing reasons, defendants' motion is GRANTED.

I.     BACKGROUND

    Tule Lake Committee, a non-profit representing the "survivors and descendants of those incarcerated at Tule Lake during World War II," brings this case against the City of Tulelake (the "City"), the City Council of Tulelake, and the Modoc Tribe of Oklahoma.[1] Am.

---

[1] Tule Lake was the site of the Tule Lake Segregation Center, where over 18,000 men, women, and children of Japanese ancestry were unconstitutionally imprisoned during World War II. Takei Decl. ¶ 1, ECF No. 57-1; Am. Comp. ¶ 9. Plaintiffs represent the Tule Lake Segregation Center is of particular significance, because it was used to incarcerate those from

1

Compl., ECF No. 5, ¶¶ 3–6. The case arises out of the City Council's decision to sell the Tulelake Municipal Airport (the "airport site") to the Modoc Tribe, despite the Committee's attempts to purchase the airport site and have it designated as part of the Tule Lake Unit, which is part of the WWII Valor in the Pacific National Monument ("Tule Lake National Monument"). *See id.* ¶ 17; Opp'n, Ex. 1, ECF No. 57-2, at 2. The Committee represents the airport site is significant in particular because it contains two-thirds of the camp's former barracks sites, where Japanese Americans lived during their incarceration. Opp'n, ECF No. 57, at 18–19; Tender of Evidence, Ex. B, ECF No. 42-2, at 2.

In August 2018, the Tule Lake Committee moved to enjoin the City from selling the airport site to the Modoc Tribe; the court denied that motion. ECF No. 13. The Committee simultaneously filed a complaint against defendants alleging a violation of Section 6 of Article XVI of the California Constitution,[2] violation of the Equal Protection Clause, violation of the First Amendment, and a violation of the Ralph Brown Act.[3] *See generally* Am. Compl.

On September 27, 2018, the parties participated in a settlement conference before the assigned magistrate judge. As a result, the parties reached an interim settlement agreement. *See generally* Stipulation to Interim Settlement Agreement; Order ("Stipulation"), ECF No. 31. The parties appeared to agree the Committee cannot achieve its objective unless certain government agencies are willing to designate the airport site as part of the Tule Lake National Monument. *See* Mot. at 4. Accordingly, the parties stipulated to staying the case for 180 days and imposed the following conditions:

>   1.   If within 180 days of this stipulation and order there is no evidence of likely final approval by controlling government agencies

---

other camps "who resisted their imprisonment and were deemed disloyal." Takei Decl. ¶ 1. According to plaintiff's complaint, over 331 people died in the Tule Lake camp during that time. Am. Compl. ¶ 9.

[2] "The Legislature shall have no power . . . to authorize the giving or lending, of the credit of the State, or of any . . . city . . . of any public money or thing of value to any individual, municipal or other corporation whatever; . . . ." Am. Compl. ¶ 55 (quoting Cal. Const. Art. XVI § 6).

[3] Cal. Gov't Code § 54956.8 ("Real property transactions; closed meeting with negotiator").

>to designate the airport site facility at issue as part of the Tule Lake unit of the National Park Service, then plaintiff Tule Lake Committee will dismiss the pending action without prejudice.
>
>2. If within 180 days of this stipulation and approval there exists evidence of likely approval by controlling government agencies to designate the airport site facility at issue as part of the Tule Lake unit of the National Park Service, the parties agree to continue negotiations in good faith as to all remaining issues.

Stipulation at 2.

Before the 180-day period expired, plaintiff filed a Tender of Evidence offering two letters as evidence to show "likely final approval by controlling government agencies to designate the airport site facility as part of the Tule Lake unit of the National Park Service." *See* Tender of Evidence, ECF No. 42. In response, the magistrate judge held a status conference, and, finding the parties disagreed on whether plaintiff met its burden to continue negotiations, referred the case back to the undersigned. *See* ECF Nos. 45, 48. After holding its own status conference on this matter and identifying the same disagreement, this court issued an order directing defendants to file a motion to enforce the settlement or an explanation as to why it declines to do so. ECF No. 53. Defendants filed the instant motion to enforce the interim settlement agreement soon after. Mot., ECF No. 54. Plaintiff opposed the motion, ECF No. 57, and defendants replied, ECF No. 58. The court addresses the legal question before it raised by defendants' motion, which in no respect challenges plaintiff's claims regarding the historical and interpretive significance of the entire Tule Lake site, including the area encompassed by the airport site.

II. LEGAL STANDARD

"[A] district court has the equitable power to enforce summarily an agreement to settle a case pending before it." *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987) (citations omitted). "[A] motion to enforce [a] settlement agreement essentially is an action to specifically enforce a contract," *Adams v. Johns-Manville Corp.*, 876 F.2d 702, 709 (9th Cir. 1989), and the "court's enforcement power include[s] authority to award damages" or specific performance. *T.N.T. Marketing, Inc. v. Agresti*, 796 F.2d 276, 278 (9th Cir. 1986) (citations omitted). Generally, "[t]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." *Jeff D. v. Andrus*,

3

899 F.2d 753, 759 (9th Cir. 1989) (citation omitted). Under California law, "a settlement agreement is a contract, and the legal principles [that] apply to contracts generally apply to settlement agreements." *Weddington Productions v. Flick*, 60 Cal. 4th 794, 810 (1998).

"[T]he district court may enforce only complete settlement agreements." *Callie*, 829 F.2d at 890 (emphasis omitted) (citations omitted). A complete agreement requires: (1) accord on all "material terms"; and (2) "the intent of the parties to bind themselves." *Id.* at 891 (emphasis omitted). Intent may be established "[i]f the record . . . show[s] that the [parties] had agreed to the settlement, or that the attorneys had authority to settle the suit and dismiss the action[.]" *Harrop v. W. Airlines, Inc.*, 550 F.2d 1143, 1144 (9th Cir. 1977).

III. DISCUSSION

Neither party disputes the enforceability of the interim settlement agreement. Rather, they disagree whether plaintiff has met the evidentiary burden it accepted to justify further settlement negotiations. Though both parties attempt to raise myriad ancillary issues in their briefing, defendants are correct when they frame the parties' dispute as "a narrow one: does the Committee's Tender of Evidence (Doc. 42) demonstrate likely final approval by controlling government agencies to designate the airport site facility as part of the Tule Lake National Monument, and thus require the parties to continue negotiations in good faith?" Reply at 4. Defendants are correct that the evidence tender does not meet plaintiff's burden. *See id.*

A. Meaning of "Likely"

As an initial matter, the court must clarify the meaning of the word "likely," as modifying "final approval," so as to give effect to the parties' mutual intent "as it existed at the time of contracting, Cal. Civ. Code § 1636. *See TRB Investments, Inc. v. Fireman's Fund Insurance Company*, 40 Cal. 4th 19 (2006) ("[T]he 'clear and explicit' meaning of [provisions in a contract] interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage,' controls judicial interpretation." (citation omitted)). "A court may look to general dictionary definitions to aid its analysis of a

/////

term's meaning." *In re Lusk*, 589 B.R. 678, 686 (Bankr. E.D. Cal. 2018) (citing *Scott v. Continental Insurance Company*, 44 Cal. App. 4th 24 (1996)).

Black's Law Dictionary defines "likely" as "1. Apparently true or real; probable," as in "the likely outcome" and "2. Showing a strong tendency; reasonably expected," as in "likely to snow." *Likely*, Black's Law Dictionary (11th ed. 2019); *cf. Alexander Mfg., Inc. Employee Stock Ownership Plan & Tr. v. Illinois Union Ins. Co.*, 560 F.3d 984, 988 (9th Cir. 2009) (relying in part on Black's Law Dictionary definition to interpret ambiguous term in contract). Based on the term's use in the settlement agreement and the context of the agreement provided by the parties, *see, e.g.*, Takei Decl. ¶¶ 25–40, ECF No. 57-1, the court finds the latter definition most applicable. In other words, plaintiff agreed to dismiss the case without prejudice, if, after 180 days, it could produce no evidence showing "a strong tendency" that final approval "by controlling government agencies to designate the airport site facility at issue as part of the Tule Lake unit of the National Park Service" will occur. Put another way, the evidence must show such approval can be "reasonably expected."

    B. <u>Plaintiff's Evidence</u>

The Committee's Tender of Evidence consists of two letters: one from Jonathan B. Jarvis, a retired official of the National Park Service (NPS), dated March 25, 2019, Jarvis Letter, ECF No. 42-1; and one from Randolph Lavasseur, Deputy Regional Director of the NPS, Pacific West Region, dated March 22, 2019, Lavasseur Letter, ECF No. 42-2. Neither constitutes evidence of likely approval by controlling government agencies of designating the airport site as part of the Tule Lake National Monument (the "Monument"). The court addresses each in turn.

      1. <u>The Jarvis Letter</u>

Plaintiff offers the letter from Jonathan B. Jarvis, who was acting director of the NPS from 2009 until 2017. Jarvis Letter at 2. Jarvis explains why he believes the airport site is an "important part of the historic site" of Tule Lake: "a part that the Service would have liked to include in the National Monument at its creation," but did not because, at the time the monument was created, "the political leadership in the Department of the Interior were averse to including

5

any private lands within the boundaries." *Id.* Jarvis states, "[s]hould the opportunity arise, the Service would have every reason to take the steps needed to add the airstrip property to the Monument." *Id.* at 3.

Defendants argue the Jarvis letter is irrelevant to the question of whether final approval by NPS is likely, because Jarvis no longer worked for NPS at the time he wrote it. Mot. at 14–15. While this fact does not render the letter completely irrelevant, it does reduce its value as evidence of NPS's likely final approval. Jarvis provides insight into the inner-workings and priorities of the agency during his tenure as Director, which is relevant to, but not necessarily illustrative of, what the agency's priorities are today, or what they will be in the foreseeable future. Furthermore, Jarvis does not actually predict NPS would likely approve the airport site as part of the Monument. Instead, he states that, in the past, the agency "would have liked to" include the site. Jarvis Letter at 3. He also observes that "the Service would have every reason to take the steps needed" to add the airstrip site, if the owner of the airport site were willing to sell the land. *Id.* at 2–3 (noting the agency's plan was to "someday including other historic resources within areas purchased from willing sellers"). However, as defendants point out, it appears the current owner intends to continue using the land as an airport and has not signaled any willingness to sell. Reply at 4–5. Ultimately, Jarvis' noncommittal statements are evidence of possible NPS approval, but do not show a "strong tendency" that NPS will approve the airport site, nor that such approval is "reasonably expected" to occur. *See Likely*, Black's Law Dictionary (11th ed. 2019). Without more, plaintiff has not met its burden with the Jarvis letter.

2. The Lavasseur Letter

Plaintiff's second piece of evidence is a letter from Randolph Lavasseur, the Deputy Regional Director of the NPS Pacific West Region. Lavasseur Letter at 2. Lavasseur acknowledges "there are numerous historic resources related to the WWII era located outside the boundary of the monument," and lists several historical structures, including the barracks located on the airport site. *Id.* at 2–3. Yet, he commits only to continuing to "engage the public through our interpretive and education programs, tourism, and through ranger guided interactive tours to promote the entire site." *Id.* at 3.

6

1    Plaintiff argues the Lavasseur letter is "not direct but circumstantial evidence of
2    likely future action by NPS." Opp'n at 19.  In particular, plaintiff highlights that one of the items
3    in Lavasseur's list of "historic resources outside the boundary of the monument" includes the
4    airport site, specifically "the designated blocks where the Japanese Americans actually lived
5    during their incarceration," which is "one of the overarching features" of the historic site that is
6    "not part of the national monument." Lavasseur Letter at 2 (emphasis in original).  Plaintiff urges
7    the court to "connect the dots" between this statement and a statement in the NPS's General
8    Management Plan for the Monument that lists "residential" areas among the lands that "have
9    value in their ability to interpret the major themes that make the Tule Lake Unit nationally
10   significant." Opp'n at 19 (citing Tule Lake General Management Plan, ECF No. 57-2, at 7).  At
11   best, these statements show NPS recognizes the historic value of the airport site.  However,
12   evidence that NPS recognizes the airport site's value is not sufficient to show the agency is likely
13   to approve including the site as part of the Monument.  The Lavasseur letter does not show there
14   is a "strong tendency" NPS will approve the site, nor that approval by NPS is "reasonably
15   expected," as contemplated by the parties' agreement.

### 3.    Absence of Evidence of Congressional Support

17   While the court need go no further in its review of the record, it notes that
18   defendants also argue plaintiff's failure to provide evidence of Congressional support for
19   plaintiff's goal is dispositive. Mot. at 10.  Ultimately, defendants argue, the NPS could not
20   include the airport site as part of the Monument without Congressional authorization to expand
21   the Monument's boundaries. *Id*.  Plaintiff counters that the language of the settlement agreement
22   only requires evidence of approval by controlling government agencies, and Congress is not an
23   agency. Opp'n at 12.  Furthermore, plaintiff argues NPS "takes a leading role with respect to
24   Congressional boundary modification enactments," and therefore evidence of NPS's likely
25   approval implies Congressional approval. Opp'n at 13.  Even so, plaintiff does not offer evidence
26   to show NPS would—or could—gain Congressional support for expanding the Monument.  Such
27   evidence, paired with evidence of NPS's expressed desire however general to expand the
28   /////

Monument to include the airport site, might have been sufficient for plaintiff to meet its burden under the Interim Settlement Agreement for further settlement discussions.

Moreover, plaintiff concedes that "the existing Washington DC political environment . . . currently is not supportive of National Parks, including their expansion." Opp'n at 19 n.3. While this may explain why plaintiff has been unable to obtain stronger evidence of likely approval by controlling government agencies, it does not relieve plaintiff of the evidentiary burden it agreed to meet before settlement discussions would be reopened and the case maintained. *See* Stipulation at 2.

### C. Specific Performance

For the foregoing reasons, plaintiff has not established "likely final approval by controlling government agencies to designate the airport site facility at issue as part of the Tule Lake unit of the National Park Service," Stipulation at 2. Therefore, "there is no evidence of likely final approval by controlling government agencies," and, by the terms of the Interim Settlement Agreement, plaintiff is required to "dismiss the pending action without prejudice." Stipulation at 2. Defendants request the court order specific performance and direct plaintiff to dismiss the action without prejudice. Mot. at 7.

To obtain specific performance of a valid contract, the requesting party must show: (1) the underlying contract is both reasonable and supported by adequate consideration; (2) the existence of mutuality of remedies; (3) the legal remedies are inadequate; (4) contractual terms are sufficiently definite to inform the court of what is to be enforced; and (5) the requested performance is substantially similar to the performance promised in the contract. *See Lansmont Corp. v. SPX Corp.*, No. 5:10-CV-05860 EJD, 2012 WL 6096674, at *5 (N.D. Cal. Dec. 7, 2012) (citing *Real Estate Analytics, LLC v. Vallas*, 160 Cal. App. 4th 463, 472 (2005)).

Plaintiff does not dispute these elements are satisfied here. The Interim Settlement Agreement as a whole appears reasonable and supported by adequate consideration, as plaintiff entered into it voluntarily and benefited from defendants' agreement to stay the case for 180 days. There is mutuality in the remedies available in that plaintiff, like defendants, could seek specific performance to enforce the agreement's terms had plaintiff met its evidentiary burden. *See*

*Henderson v. Fisher*, 236 Cal. App. 2d 468, 473 (1965) ("[T]here must be a mutuality of remedies, that is, the contract must be subject to specific performance by both of the contracting parties[.]"). The remaining three requirements are also met: money damages are an inadequate substitute for dismissal of the case; the terms of the agreement are clear; and defendants request precisely the performance promised in the settlement: dismissal of the case without prejudice. *See* Mot at 21.

Accordingly, the court grants defendants' request for specific enforcement of the terms of the Interim Settlement Agreement.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to enforce the interim settlement agreement is GRANTED, and plaintiff is DIRECTED to dismiss the case without prejudice within seven (7) days.

This order resolves ECF No. 54.

IT IS SO ORDERED.

DATED: March 10, 2020.

_____
CHIEF UNITED STATES DISTRICT JUDGE